## Case No. 5,288.

### GAYTES v. LEWIS.

[2 Biss. 136;[1] 2 Chi. Leg. News, 385.]

Circuit Court, N. D. Illinois. April, 1869.

CORPORATIONS— POWER TO MORTGAGE PROPERTY.

1. A corporation organized under the Illinois statute of February 18, 1857 [Gross' St. 1871, p. 130], has the power to mortgage its property.

2. This statute is independent of the act of February 10, 1849 [Gross' St. 1871, p. 126].

This was a bill in equity by Carol Gaytes, assignee of the Union Glass Company, bankrupt, to enjoin —— Lewis from foreclosing a mortgage given to the defendant by the company prior to its bankruptcy.

Asay & Lawrence, for plaintiff.
Hitchcock & Dupee, for defendant.

DRUMMOND, District Judge. The only question in this case is as to the power of the Union Glass Company to make a mortgage of some property belonging to the company. It is contended on the part of the plaintiff that a mortgage made by the company was invalid, as being ultra vires, and not within the authority of the company to make. The question arises under the act of 1849 and the act of 1857 (Gross' St. 1871, pp. 126, 130, tit. "Corporations," etc.). It is claimed on the part of the plaintiff, that the act of 1849 operates upon the company and disables it from making a mortgage.

The second section of the act of 1849 provided that when a company had been created, as provided in the first section, and a certificate had been filed, properly signed and acknowledged, the persons who thus become a body corporate and their successors, should be a corporation by the name stated in such certificate; that they should have succession, sue and be sued; have a common seal, "and they shall by their corporate name be capable in law of purchasing, holding and conveying any real or personal estate whatever, which may be necessary to enable the said company to carry on their operations named in such certificate, but shall not mortgage the same or give any lien thereon:"

Undoubtedly if this law was binding on the company, it would not have the power of making a mortgage such as was made in this case; but the act of 1857 contains no such restriction. In many respects it seems to be a duplicate of the act of 1849, but in some particulars, the act of 1857 is different; for example, the act of 1849 requires the certificate to be filed in the office of the clerk of the county in which the business was to be transacted. The act of 1857 requires the certificate to be filed in the office of the clerk of circuit court, etc., and there are some minor differences in the two acts; and the second section of the act of 1857 declared that the capital stock of the company should not be less than $10,000, nor more than $500,000; the time of its existence was not to exceed fifty years, and also provided that the capital stock should be fully paid within four years, otherwise it was to work a dissolution of the company, and then the third section declared, "when the certificate, shall have been filed, as aforesaid with the clerk of said court, and a duplicate thereof filed in the office of the secretary of state, the said clerk shall issue a license to the person who shall have signed and acknowledged the same, on the reception of which they and their successors shall be a body politic and corporate, in fact and in name by the

---

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

name stated in such certificate, and by that name shall have succession, and be capable of suing and being sued in any court of law or equity in this state, and may have a common seal, and alter the same at pleasure and be capable, in law, of purchasing and holding, conveying and disposing of any such real or personal estate," &c.

Now, it is admitted by the case that the company was organized under this law of 1857. The question is whether the provision contained in the second section of the act of 1849 operated upon it and continued as a binding condition upon a company organization under the act of 1857. Independent of that, there is no doubt that the language contained in the third section of the act of 1857 would be sufficient to enable the company to make a mortgage. The language is of such a character as in similar cases has been held to imply the power to encumber and mortgage property. "Shall be capable in law of purchasing and holding, conveying and disposing of any such real and personal estate, choses in action, and securities, negotiable or otherwise, as may be expedient and necessary to enable the said company to carry on their operations and business, named in such certificate."

Without some limitation upon that language, the necessary construction of it would be that the company would have the power to mortgage and encumber their real property.

I am inclined to think that this law of 1857 must be construed as independent of the law of 1849; that the condition annexed to the law of 1849 did not necessarily follow and operate upon the law of 1857. Therefore, I think the mortgage a valid lien. Bill dismissed.

---

## Case No. 5,289.

### The GAZELLE.

### [1 Spr. 378.] ¹

District Court, D. Massachusetts. Feb., 1858.

ADMIRALTY — ARREST OF VESSEL IN HANDS OF SHERIFF—EFFECT OF SHERIFF'S SALE ON PARAMOUNT LIENS FOR WAGES.

1. A vessel being in the possession of a sheriff, by virtue of a writ of attachment on mesne process, from a state court, and the marshal holding a warrant to arrest the same vessel, in a suit by seamen for wages, the sheriff refused to permit the marshal to take possession of the vessel, and the latter returned his precept unexecuted. The court refused to proceed to exercise jurisdiction over the vessel.

2. Whether the sheriff had a right to exclude the marshal from executing process, to enforce a paramount lien, and whether the marshal might have taken possession by force, are grave questions.

3. A sale by a sheriff, on execution for debt, under the laws of Massachusetts, has none of

¹ [Reported by F. E. Parker, Esq., assisted by Charles Francis Adams, Jr., Esq., and here reprinted by permission.]

the characteristics of an admiralty sale, and does not divest paramount liens.

[Cited in The Island City, Case No. 7,109; Crosby v. The Lillie, 40 Fed. 368; The Cerro Gordo, 54 Fed. 392.]

4. A court of admiralty will enforce such liens, by ordering the arrest and sale of the vessel, and from the proceeds satisfy the liens, and then pay over the residue to the purchaser under the sheriff's sale.

5. Where a voyage was broken up by a sale of the vessel on execution, the seamen were allowed wages up to the time of the sale, and compensation for their time and expenses in returning to their home port.

6. While mariners properly remain by their vessel, if subsistence be not furnished them by the master, they may recover the amount which they have properly paid therefor.

[Cited in The Champion, Case No. 2,584; Worth v. The Lioness No. 2, 3 Fed. 925.]

[See Brown v. The Alexander McNeil, Case No. 1,988.]

7. An attachment of a vessel on mesne process, does not break up the voyage.

[8. Cited in The Maggie Hammond, 9 Wall. (76 U. S.) 457, and in The Becherdass Ambaidass, Case No. 1,203, to the point that our admiralty courts have full jurisdiction over suits between foreigners, if the subject-matter of the controversy is of a maritime nature; but that the question is one of discretion in every case.]

In admiralty.

E. F. Miller, for libellants.

Josiah W. Hubbard, for claimants.

SPRAGUE, District Judge. This is a libel for wages, by two seamen, against a small British vessel, belonging to Cornwallis, in the province of Nova Scotia. The suit is prosecuted with the approbation of the British consul at Boston, and is resisted by the claimants [Young and others], purchasers under a sheriff's sale. On the sixth day of November, 1857, these libellants shipped at Cornwallis, for a voyage from that place to Boston, and back; one of them, Clark, as mate, for $19 per month, and the other, Murphy, as seaman, for $15 per month. Under this contract the vessel arrived at Boston, on the seventh day of December last; and on the eighth of the same month, she was arrested by a sheriff, by virtue of a process from a state court, sued out by a creditor of the owners of the vessel. This proceeding is called an "attachment on mesne process." Those not conversant with the local law of Massachusetts, are often misled by the use of the word "attachment." The object is not to compel an appearance by the defendant; but the property of the debtor is taken by the sheriff, and held by him, as security for the payment of any judgment which the plaintiff may recover. A judgment was recovered by the creditor in the state court, and execution issued thereon; and on the 30th day of January last, the sheriff sold the vessel at auction, by virtue of that execution, and she was immediately afterwards delivered to the purchasers. This libel was filed on the 23d of December, 1857, and on the same day, a warrant was issued for the arrest of the vessel.

The marshal attempted to execute this process, but found the sheriff in possession, claiming to hold her under the writ of attachment from the state court; and as he refused to permit the marshal to enter upon the vessel, or to take her into his custody, the latter desisted from the attempt. In that state of the case, I refused to proceed to exercise jurisdiction over her. Whether the sheriff could rightfully refuse to permit the marshal to take possession, in order to enforce a paramount lien, and whether the marshal could properly have proceeded to execute his precept, by force, in the same manner as against unlawful resistance by a private individual, are grave questions, which I do not now decide. Whatever may have been the respective rights and duties of the two executive officers, the fact was, that the marshal had never had possession, and returned his precept unexecuted, and this debarred the court from proceeding further. I could not exercise jurisdiction over a vessel which was not, and had never been, in the custody of any officer of the court.

On the 27th day of January, 1858, on motion of the proctor for the libellant, another warrant to arrest the vessel was issued, which was duly executed on the 5th of February, before which time the custody of the sheriff had ceased, he having delivered the vessel to the purchasers under the sheriff's sale.

Although the sheriff was permitted to hold possession of this vessel, until he had sold her on execution, and had terminated his custody by a delivery to the purchaser, such sale and delivery did not divest or impair the lien of the libellants. The purchaser took the vessel cum onere. The sale by the sheriff was by the common-law writ of fieri facias only. The prior attachment on mesne process had only the effect of bringing the property within the reach of the writ of execution, but gave no efficacy to the sale, which derived all its force from the execution. In such a suit, no notice is given, except to the debtor, and his rights alone are affected. It is a suit in personam merely. It is in no respect a suit in rem. Neither the writ of attachment, nor of execution, directed the officer to take this vessel, or even named her, but they both ran against the debtor, and all his goods and chattels. Such a sale has none of the characteristics of an admiralty sale, upon process in rem, after notice to all the world, to intervene for their rights or interests. As soon, therefore, as the sheriff had delivered this vessel to the purchaser, the marshal arrested her, to enforce the lien of these libellants; and the purchaser being well advised by counsel, has not contested the paramount right of the libellants to proceed against the vessel, and to have her sold under a decree of this court, for the payment of their claim. The only question now made is, as to the amount which should be decreed to the respective libellants. The voyage has been broken up by the fault of the owner, as he permitted the vessel to be sold for his debt. This was a violation of his contract with the libellants, for which they have a right to recover a full indemnity. To constitute this indemnity, they are entitled to their wages, so long as they were properly attached to the vessel, and thereafter, up to the time when, with reasonable diligence, they may return to Cornwallis, and their necessary expenses while remaining here, and in so returning.

It is insisted in behalf of the claimants, that the voyage was broken up by the attachment, and that the connection of the libellants with the vessel then ceased; but this position is not tenable; it would be unsound in principle, and of the most mischievous consequences, to hold that a mere attachment by mesne process, under the law of Massachusetts, terminated the voyage, and dissolved the contract between the mariners and the owners. Such an attachment may be made for any alleged amount of debt, by any person, without previous application to any court or magistrate, and without even an affidavit that any debt was due. The attachment may be dissolved, and possession restored to the owner, in various ways, as by payment of the debt, or giving security for the payment of the judgment that may be recovered, or by withdrawal of the suit, or by judgment's being rendered in favor of the defendant. Where a neutral vessel has been taken on the high seas, by the cruisers of a belligerent, and carried into port, for trial, it has been held that the seamen who remained by the ship are entitled to wages, to the time of condemnation. That is a stronger case than the present, for there the owner has no power to release the vessel, but she must be held, at the option of the captors, until adjudication. An attachment, under the law of Massachusetts, may not even delay the voyage, as it may be dissolved before the cargo is unladen. But although a mere attachment on mesne process does not break up the voyage, yet it may be attended with circumstances which will have that effect, as, indeed, it may be broken up where there is no seizure on process. Whenever it appears clearly, that the owner's possession is irretrievably lost, and that the voyage cannot be further prosecuted, the court will not permit the seamen to burden the vessel by unnecessary and wilfully adhering to her. But in the present case, the libellants have acted with propriety and good faith, in remaining by the vessel. At the time of the attachment, the owner was in Boston, and remained here until the 15th December, when he and the master left for Cornwallis, directing the libellants to remain by the vessel, as the owner intended to return and reinstate himself in possession, and pursue the voyage. The British consul also instructed them to remain. Neither the sheriff nor the attaching creditor paid, or offered to pay them any part of their wages; but on the contrary, it is apparent that the creditor was endeavoring, by means of the state process,

to deprive them of their lien. and leave them here in a foreign country, without the means of support, or of returning home, and with no ultimate remedy, except a personal suit against the owner. If he had not prevented the service of the process of this court, by the marshal, when the libel was filed, a decree might have been had, the vessel sold, and the money paid into court, within two weeks from the filing of the libel; and thus not only the wages and board of the libellants, but all the expense of detention and sale by the sheriff might have been saved. It is not for the creditor to complain that the expense, which he has created, may have diminished the amount which may be appropriated to the payment of his debt. The purchaser at the sheriff's sale knew, or ought to have known, that the vessel was subject to the lien of the libellants, and that he could purchase only in subordination thereto.

These seamen remained by the vessel, until she was sold by the sheriff, and since the 17th of December last, have been obliged to obtain their food at their own expense, the owner having made no provision for their subsistence. The supplemental libel, which was filed on the 20th January, claims wages up to that time, and the expense of board, at the rate of $3.50 per week, from the 17th December. These claims must be allowed. The libel further asks the sum of $10 for each of the libellants, for their time and expense, in returning to their homes, and I am satisfied that this also is a proper and reasonable claim. At the time this voyage was begun, there were due to Clark wages for the preceding voyage, from the 6th July to the 6th November, at $16 per month; this also must be included in the decree.

Decree for the libellant, Clark, for the sum of $102.18; and for Murphy, the sum of $71.50, and costs.

The vessel was sold by order of the court, and from the proceeds the amount of the decree was paid to the libellants, and the residue was paid over to the purchaser at the sheriff's sale, who intervened as claimant.

See The Havana [Case No. 6,226]; The Julia Ann [Id. 7,577].